# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00174-CV

---

### T. M. and O. A., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 207TH DISTRICT COURT OF HAYS COUNTY
### NO. 20-0618, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

---

## CONCURRING AND DISSENTING OPINION

I join in the Court's opinion affirming the portion of the district court's order appointing the Department as permanent managing conservator of the children. I dissent from the Court's opinion affirming the portion of the district court's order terminating Mother's and Father's parental rights.

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396

(Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

The district court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires

weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## DISCUSSION

The district court terminated Mother's and Father's parental rights to their children based on findings that Mother and Father (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, *see* Tex. Fam. Code § 161.001(b)(1)(E)(2), constructively abandoned the children, *see id.* § 161.001(b)(1)(N), and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, *see id.* § 161.001(b)(1)(O). The Court concludes that the evidence is legally sufficient but factually insufficient to support the district court's endangerment finding under subsection (E) and legally and factually sufficient to support the district court's abuse-or-neglect finding under subsection (O). For the following reasons, I disagree with these conclusions.

3

**Subsection (E), endangering conduct**

Termination of the parent-child relationship may be ordered under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). In this context, endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99.

"'Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act.'" *A.C.*, 577 S.W.3d at 699 (quoting *Asjes v. Texas Dep't of Protective & Regulatory Servs.*, 142 S.W.3d 363, 370 (Tex. App.—El Paso 2004, no pet.)). "'Termination under this subsection must be based on more than a single act or omission; instead, 'what is required is a voluntary, deliberate, and conscious course of conduct.'" *E.E.*, 598 S.W.3d at 405 (quoting *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). "In reviewing the sufficiency of the evidence under subsection (E), we 'consider conduct both before and after the Department removed the child from the home.'" *Id.* (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

"'As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.'" *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (quoting *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App. –Fort Worth 2004, pet.denied)). Thus, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *Id.* at 345. This is because illegal

4

drug use exposes children to the possibility that their parents could become impaired or imprisoned, which would endanger the children's physical and emotional well-being. *See A.C.*, 577 S.W.3d at 699. Moreover, it is well-established that endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533; *A.C.*, 577 S.W.3d at 699; *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.). In other words, the Department does not have to prove that the misconduct was directed at the child or that the child suffered an actual injury as a result of the misconduct. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699.

However, "a finding of endangerment based on drug use alone is not automatic." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). "The party seeking termination must still present clear and convincing evidence of . . . a continuing course of conduct to satisfy the requirements of subsection (E)." *Id.*; *see In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also In re C.R.*, No. 07-20-00314-CV, 2021 WL 711498, at *3 (Tex. App.—Amarillo Feb. 23, 2021, pet. denied) (mem. op.); *In re C.L.E.E.G.*, No. 13-20-00387-CV, 2021 WL 377254, at *6 (Tex. App.—Corpus Christi-Edinburg, Feb. 4, 2021, no pet.) (mem. op.).

In this case, Department caseworker Judi Webster testified that the case began in March 2020, after Mother tested positive for methamphetamine. Father took no drug tests during the case. Webster "sent [Father] to drug test" on April 3, 2020, when she first contacted him, but Webster testified that Father did not complete that screening. There is a statement in Father's family-service plan, created in April 2020, that Father "admitted to doing methamphetamine a month ago," but in his testimony, Father denied making any such admission. Father testified that he "smoked pot" when he was younger but that he did not use any other illegal drugs. When

5

asked when he had last used drugs, Father testified, "Been about four years." Father denied telling a caseworker that he had used methamphetamine, and he also denied being "aware that [his] plan of service states that [he] admitted to using that." Moreover, when Webster was asked if she was aware of Father ever admitting that he used drugs, she testified, "He has not—I have not been informed of that. No."

The family-service plans for both Mother and Father ordered them to "submit to random drug screenings within 8 hours of the Department's request." In her testimony, Mother acknowledged that she was aware that she had been ordered to submit to random drug screenings and had not done so. Father did not take the initial drug screen requested by Webster on April 3, 2020, and the record reflects that no other drug tests were scheduled for him during the case.

Although the above evidence would support a finding that Mother and Father had used illegal drugs, there was no evidence presented as to how that drug use endangered the children's physical or emotional well-being. As Mother explains in her brief:

> There was no evidence in the record that at the time of removal the children were unhealthy, malnourished, or injured in any way. There was no evidence they were dirty, had lice, or were not properly clothed. There was no evidence the children were not attending school as required. There was no evidence the children had not heretofore received the requisite routine medical or dental care such that might be required of children of such an age.

Additionally, there was no evidence presented as to the extent or duration of Mother's drug use, that Mother had used drugs while caring for the children, that the children were aware of Mother's drug use, that Mother's drug use had exposed the children to dangerous individuals, or that Mother was facing criminal charges or incarceration as a result of her drug use. In sum, there was no evidence that Mother's drug use had endangered the children in any way, either

6

directly or indirectly. Moreover, the Department failed to present any evidence that Mother's experiencing homelessness constituted a "voluntary, deliberate, and conscious course of conduct" that endangered the children.

The Department also failed to present evidence as to how Father engaged in a "voluntary, deliberate, and conscious course of conduct" that endangered the children. Father admitted to "smoking pot" four years ago but denied that he used any other illegal drugs. The evidence of Father's methamphetamine use was limited to a single statement in his April 2020 family-service plan that Father had "admitted to doing methamphetamine a month ago," an admission that Father denied making and that the Department caseworker testified she was unaware that Father had made. Moreover, the children were not in Father's care during the one time that he allegedly admitted to using methamphetamine, and there was no evidence presented that Father had placed the children in Mother's care when she was using methamphetamine or that he was aware of Mother's methamphetamine use. On this record, I conclude that the evidence is legally and factually insufficient to support the district court's finding that Mother and Father engaged in a "voluntary, deliberate, and conscious course of conduct" that endangered the children's physical or emotional well-being. *See C.V.L.*, 591 S.W.3d at 757–59 ("While unquestionably an exercise of poor judgment, Father's use of methamphetamines on two occasions, standing alone, does not rise to the level of a conscious course of conduct.").[1]

---

[1] I do not disagree that there may be cases "in which a parent's drug use might be so pervasive or serious, even in the absence of evidence of conduct that directly endangers the child or limited to times when the child was not in the parent's direct care, that the drug use on its own" could support a finding of a causal link to endangerment. *See T.M. v. Texas Dep't Fam. & Protective Servs.*, No. 03-21-00174-CV, slip op. at 13 n.2 (Tex. App.—Austin Oct. 7, 2021, no pet. h.) (mem. op.). However, this is not such a case. Mother tested positive for methamphetamine once, at the beginning of the case, and missed an unspecified number of drug tests thereafter. As for Father, even when viewed in the light most favorable to the finding, there

**Subsection (O), compliance with family-service plans**

To terminate parental rights under subsection (O), the Department must show by clear and convincing evidence that (1) the child was removed under Chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain return of the child." *See* Tex. Fam. Code § 161.001(b)(1)(O). On appeal, Mother and Father argue that there is insufficient evidence that the children were removed from the parents under Chapter 262 for "abuse or neglect."

Whether a child was removed for "abuse or neglect" depends on the surrounding facts and circumstances and is generally determined on a case-by-case basis. *In re S.M.R.*, 434 S.W.3d 576, 583 (Tex. 2014); *D.F. v. Texas Dep't of Fam. & Protective Servs.*, 393 S.W.3d 821, 830 (Tex. App.—El Paso 2012, no pet.). The phrase "abuse or neglect" is not defined in Chapter 262, and the chapter does not indicate any special or technical meaning for the phrase. *In re S.M.R.*, 434 S.W.3d at 582-83. However, the phrase "abuse or neglect" is "used broadly" and is not limited to allegations of actual abuse or neglect inflicted on a child but, instead, "necessarily includes the risk or threats posed by the environment in which the child is placed." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). "If a parent has neglected, sexually

is only the barest of evidence that he admitted using methamphetamine once, at the beginning of the case. Moreover, although he did not take the initial drug screen requested by the Department, the record is devoid of any evidence showing that Father ever tested positive for methamphetamine or missed any scheduled drug tests. On this record, I cannot conclude that the parents' drug use, either standing alone or combined with other circumstances in the case, would support a finding of endangerment.

8

abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate," that child has been removed for "abuse or neglect." *Id*.

Here, there was no evidence presented that the children were "neglected, sexually abused, or otherwise endangered" at the time of their removal. Department caseworker Webster testified that the case began when Mother tested positive for methamphetamine and that the Department also had concerns regarding Mother's homelessness, but neither Webster nor any other witness provided testimony as to the extent of Mother's drug use or the surrounding circumstances of Mother's living situation so as to support a finding that the children were subjected to or at risk of abuse or neglect.[2] There also was no documentary evidence to support such a finding.[3]

The Court acknowledges that "there was no evidence about the extent of Mother's drug use or the family's living situation at the time of removal," but it nevertheless concludes

---

[2] "Abuse" can include a parent's use of illegal drugs, but only if it is "in a manner or to the extent that the use results in physical, mental, or emotional injury to a child." Tex. Fam. Code § 261.001(1)(I). The Department presented no evidence that Mother had used drugs in such a manner or to that extent. "Neglect" can include "the failure to provide a child with food, clothing, or shelter necessary to sustain the life or health of the child, excluding failure caused primarily by financial inability unless relief services had been offered and refused." *Id*. § 261.001(4)(a)(ii). The Department presented no evidence that Mother had failed to provide the children with food, clothing, or shelter necessary to sustain their life or health or that, even if she had, such failure was not caused primarily by financial inability.

[3] The clerk's record contains an "affidavit in support of non-emergency removal" that was attached to the Department's petition but was not admitted into evidence at trial and thus cannot be considered in our sufficiency analysis. *See C.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00229-CV, 2017 WL 3471072, at *3–4 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.) (explaining that in termination cases, sufficiency review is limited "only to the evidence adduced at trial and the properly noticed contents of the trial court's file"); *see also B.L.M. v. J.H.M., III*, No. 03–14–00050–CV, 2014 WL 3562559, at *11 (Tex. App.—Austin July 17, 2014, pet. denied) (mem. op.) ("A court may take judicial notice of the existence of pleadings and other documents that have been filed in a case, but the court cannot take judicial notice of the truth of allegations in those documents unless they have been admitted into evidence.").

that "the trial court's temporary orders provide additional support for a finding of removal for neglect." *T.M. v. Texas Dep't Fam. & Protective Servs.*, No. 03-21-00174-CV, slip op. at 18 (Tex. App.—Austin Oct. 7, 2021, no pet. h.) (mem. op.). I disagree. The temporary orders do not recite the factual bases for the findings contained within the orders, and there is no evidence in the record to support those findings. We do not have a record of the full adversary hearing held in the court below or any other status hearing held prior to trial. We have the removal affidavit, noted above, *see supra* n.3, but because the affidavit was not admitted into evidence at trial, it cannot be considered in our sufficiency analysis. *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

Under subsection (O), it is not enough to show that the parents failed to comply with the terms of their family service plan, as the Department did here. The Department has the additional burden to prove, by clear and convincing evidence, that the children were removed for abuse or neglect. *See E.C.R.*, 402 S.W.3d at 246. On the evidentiary record before us, which is limited to the testimony and exhibits admitted at trial, I am unable to conclude that the Department satisfied that burden here.

**Subsection (N), constructive abandonment**

Subsection (N) provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has constructively abandoned (1) a child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and (2) the Department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained contact with the child; and (4) the parent has demonstrated an

10

inability to provide the child with a safe environment. *See* Tex. Fam. Code § 161.001(b)(1)(N). "If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails." *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). On appeal, Mother and Father assert that the Department failed to meet its burden to establish that (1) they have not regularly visited or maintained contact with the children and (2) they have demonstrated an inability to provide a safe environment for the children.

A parent fails to regularly visit or maintain significant contact with their children when the parent fails to take advantage of visitation rights or when "visits are intermittent or sporadic." *C. G. v. Texas Dep't of Fam. and Protective Servs.*, No. 03-18-00852-CV, 2019 WL 3367524, at *7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.); *In re S.S.*, No. 11 05 00083-CV, 2006 WL 1285125, at *3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.). Here, Mother's and Father's visitation plans allowed them one hour of supervised visits every other week. The visits were conducted via Zoom due to COVID-19 restrictions.

Webster testified that Mother's and Father's visits were "sporadic." Regarding Mother, Webster testified that "[i]n the beginning, Mom was doing visitation well. She was reaching out to the children." However, as the case progressed, Mother "would miss about one or two, which would be, like, a whole month because they were only getting two visits a month, per visitation plan. And she would miss several different visits." Webster added, "I don't have the amount—the total number . . . . [B]ut she was—like, months in a row, she would miss visitations with the children." Regarding Father, Webster testified that he was "making appearances at least one of those a month" but that he "missed every other visit." Father's "last visit was at the beginning of August" and "then he quit visits after that." The visits with both

11

Mother and Father were stopped in September 2020 due to Mother and Father failing to complete other court-ordered services.

Viewed in the light most favorable to the district court's finding, I conclude that this evidence is legally sufficient to support the district court's finding that Mother and Father failed to regularly visit or maintain significant contact with their children. Moreover, Father did not present any contrary evidence tending to show that he did not miss "every other visit" or provide any justification for his missed visits. Accordingly, I conclude that the evidence is factually sufficient to support the district court's finding that Father failed to regularly visit or maintain significant contact with their children.

However, I cannot conclude that the evidence is factually sufficient regarding Mother. At the beginning of the case, Mother "was doing visitation well" and "reaching out to the children." Webster testified that the visits were "appropriate" and that during the visits, the children "would be engaged in the conversation" and acted affectionately toward Mother, "as much as they could" given that the visits were virtual. When asked if Mother and the children had a good relationship, Webster testified, "They were close. Yes." Although Webster testified that Mother missed visits as the case progressed, she was unable to provide the total number of visits that Mother missed. Additionally, when asked about her visits, Mother testified that she tried to visit with the children "every chance she could," and she provided testimony tending to show that some of the missed visits were due to Webster not emailing her the "links" for the online visits:

> I mean, if—the—the caseworker—I would have to call her, like—I would have to call her and ask her to send me the link for the visit over and over and over again. If I didn't get ahold of her, then I couldn't have my visit. And there was a couple

12

of times that I'm . . . you know, said to have not showed up for my visit, and she didn't send me the link.

Mother added that her phone's internet service was "really bad." As a result, Mother explained, "the kids would get paused or it would freeze and I couldn't hear them. And it was very upsetting to me. In my mind, it—it would be better for my kids not to see me in tears, you know." Mother testified that she "let [Webster] know what was going on with all of that" and had bought a new phone to address the reception issues. Webster testified that she was not aware that Mother had issues with her phone, although she "recall[ed] one time [Mother] did tell [her] she got better reception outside" and that some of the virtual visits appeared to take place in Mother's car. Webster also acknowledged that Mother informed her on one occasion that she was having problems with her car. When asked if she had talked to Mother "about different ways or resources that she might have for visiting with" the children, considering that Mother had possible issues with her phone service and transportation, Webster testified, "No."

The visits were stopped by the Department altogether in September 2020. Thus, for several months before the trial concluded in March 2021, Mother was not given any opportunity to visit the children. Moreover, Mother testified in detail regarding the bond that she had with her children and how much she wanted to remain in their lives. CASA volunteer Lonette LaBorde had conversations with the children and testified that the children loved Mother and appeared to be bonded to her. I conclude that in light of the entire record, including the disputed evidence contrary to the district court's finding, the factfinder could not have formed a firm belief or conviction that Mother had failed to regularly visit or maintain significant contact with the children so as to rise to the level of "constructive abandonment" of the children. *See In re A.S.*, 261 S.W.3d 76, 89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also In re*

13

*B.P.*, No. 07–14–00037–CV, 2014 WL 3732898, at \*7–8 (Tex. App.—Amarillo July 25, 2014, pet. denied) (mem. op.) (explaining that abandonment amounts to "desertion" and concluding on facts of that case that parent's missed visits were not result of "constructive abandonment" but were due instead to factors that made visits difficult).

The other element of subsection (N) that Mother and Father challenge is the requirement that they demonstrated "an inability to provide a safe environment for the children." A factfinder may consider several factors in finding evidence demonstrated a parent's inability to provide the child with a safe environment, including the parent's participation or lack thereof in services, lack of steady housing and employment, and missed opportunities for counseling and a psychological evaluation. *M.C. v. Tex. Dep't of Family and Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, no pet.); *In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.). The factfinder should also consider a parent's financial resources, employment history, home environment, parenting skills, and demonstrated past ability or inability to care for a child. *See In re J.L.G.*, No. 06–16–00087–CV, 2017 WL 1290895, at \*10 (Tex. App.—Texarkana Apr. 6, 2017, no pet.) (mem. op.). The availability of family members or other surrogate caregivers to take care of the children while a parent may be temporarily unable to do so should also be considered. *See In re D.S.A.*, 113 S.W.3d 567, 573–74 (Tex. App.—Amarillo 2003, no pet.). The burden is not on the parents to prove that they can provide a safe environment for the children; the burden is on the Department, as the party seeking termination of parental rights, to prove that the parents are unable to provide a safe environment for the child. *See In re A.S.*, 261 S.W.3d at 90; *In re D.T.*, 34 S.W.3d at 641.

Regarding Mother, it was undisputed that she failed to comply with the terms of her family-service plan, including completing a psychological evaluation, a drug and alcohol

assessment, and protective parenting classes. However, Mother claimed that she failed to complete these services because she had difficulty contacting Webster, and she claimed not to have received a copy of the service plan until the day before she testified at trial. Mother was unemployed, homeless, and tested positive for methamphetamine when the case began. When asked if she had been able to obtain and maintain appropriate housing for her children, Mother testified, "I've been working towards that this entire time" and claimed that she now had a place to live. Mother also claimed that she had been employed "for about the last six months." Mother identified her mother as a possible placement for the children, but her mother told the Department that she did not want the children. Other possible placements on Mother's side were the father of Mother's older two daughters and Mother's sister, but Webster testified that Mother failed to provide the Department with information on them. Viewing the above evidence in the light most favorable to the finding, I conclude that it is legally sufficient to prove that Mother demonstrated an inability to provide a safe environment for the children. Moreover, I conclude that the disputed evidence contrary to the finding is not "so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." Accordingly, the evidence is also factually sufficient to support the finding.

Father, like Mother, acknowledged that he failed to comply with the terms of his service plan, including a drug and alcohol assessment, a psychosocial evaluation, and protective parenting classes. However, the evidence regarding Father's living situation was disputed. Webster testified that she had never been to Father's house or attempted to visit Father's house. Doyle, the other caseworker for Father, testified that she "didn't know the circumstances" of Father's living situation. CASA volunteer Lonette LaBorde testified that when she first contacted Father in December 2020, Father "did not have a home at the time; anywhere stable to

live," and she did not believe his living situation had changed since then. However, Father claimed that he now had a stable home, although he acknowledged that he "didn't have a stable place at that time when CASA came into play." Father explained that when the case began, he was living with and caring for his mother, who was bedridden with cancer, and that he got a home of his own in August, after his mother died.

Father testified that he has other children, that his ex-wife has custody of those children, and that his ex-wife has been a placement for CPS in the past. Father testified that he provided the name of his ex-wife to the Department as a possible placement for the children. Father also identified his sister in California (Aunt) as a possible placement for the children, and she testified at trial. Aunt testified that she began contacting the Department when the case began, asking that she be considered as a placement. She explained that she and her family had an ongoing relationship with the children and that the children were bonded to the family. Aunt also testified that she had already taken steps to become licensed and prepare for the children to be placed in her home, including purchasing a bigger vehicle, rearranging her household, taking classes online, submitting references, and almost completing the application process. Despite these efforts, Webster testified that the Department did not request a home study on Aunt or contact anyone in California to obtain more information on the status of Aunt's licensing application.

Viewing the above evidence in the light most favorable to the finding, including Father's failure to complete his services and some evidence of an unstable living situation, I conclude that it is legally sufficient to support the district court's finding that Father demonstrated an inability to provide a safe environment for the children. However, when considering the disputed evidence contrary to the finding, including a possible family placement

16

that the Department failed to research and the absence of information regarding Father's financial resources, employment history, and home environment, I conclude that the evidence is factually insufficient to support the district court's finding under subsection (N).

## CONCLUSION

Because I conclude that the evidence is legally and factually insufficient under both subsections (E) and (O), and legally sufficient but factually insufficient under subsection (N), I dissent from the Court's opinion affirming the portion of the district court's order terminating Mother's and Father's parental rights. I would reverse that portion of the district court's order, render judgment deleting the district court's findings regarding subsections (E) and (O), and remand for a new trial as to whether termination of Mother's and Father's parental rights is warranted under subsection (N). I otherwise join in the Court's opinion.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Filed: October 8, 2021

17